# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| LYNDON FITZGERALD PACE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| | ) | |
| TYRONE OLIVER, Commissioner, | ) | |
| Georgia Department of | ) | |
| Corrections, | ) | |
| | ) | |
| CHRISTOPHER CARR, in his | ) | |
| official capacity as the Attorney | ) | |
| General of the State of Georgia, | ) | |
| | ) | |
| SHAWN EMMONS, Warden, | ) | |
| Georgia Diagnostic & | ) | |
| Classification Prison | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Lyndon Fitzgerald Pace is a Georgia prisoner under sentence of death. Mr. Pace brings this action to preserve and enforce his rights under 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution.

The Equal Protection Clause guarantees that the State will treat similarly situated individuals equally. *See F.S. Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920) ("all persons similarly circumstanced shall be treated alike"). And the Due Process Clause mandates "fundamental fairness" when the State extends procedural benefits to prisoners, even where those benefits or protections are not themselves constitutionally required. *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). But in wielding its most solemn and awesome power, the power to execute its own citizens, the State has eschewed both equality and fairness.

Defendants have created two classes of death row prisoners in Georgia: (1) those whom the State agrees cannot be executed until it can satisfy the baseline conditions necessary to ensure adequate representation in clemency proceedings and pre-execution litigation and (2) an identically situated class of death-row prisoners, including Mr. Pace, who were not granted those protections. This arbitrary and flagrantly disparate treatment—particularly in a matter of life and death such as determining which prisoners will live and which will die—is odious to the Constitution, and this Court should not countenance it.

2

## Introduction

1.      On April 14, 2021, the Attorney General of the State of Georgia, on behalf of the Executive, entered into a written agreement with, among others, the Federal Defender Program, Inc. ("the Federal Defender") regarding the resumption of executions in Georgia following the COVID-19 pandemic (the "Agreement"). This Agreement was negotiated and drafted at the behest of the Criminal Matters Sub-Committee of Georgia's Judicial COVID-19 Task Force, and its express and obvious purpose was to ensure that the capital defense bar was able to provide adequate counsel to death-sentenced clients facing potential execution, both in the months-long process of preparing for clemency proceedings and during the frantic time period immediately leading up to execution proceedings.[1]

---

[1] As the Supreme Court of Georgia explained, the restrictions necessitated by COVID 19 "not only hindered capital defense counsel's ability to prioritize clemency investigations for the growing number of inmates eligible for execution but also impaired counsel's ability to meet with their clients and conduct investigations in order to prepare for clemency proceedings and adequately represent their clients." *State v. Fed. Def. Program, Inc.*, 315 Ga. 319, 320 (2022).

2.     In furtherance of those goals, the Agreement specified three conditions that must occur prior to the resumption of executions:

- "the final COVID-19 judicial emergency order entered by the Chief Justice of the Supreme Court of Georgia expires;

- "the Georgia Department of Corrections lifts its suspension of legal visitation, and normal visitation resumes;" and

- "a vaccination against COVID19 is readily available to <u>all</u> members of the public."

*See* Agreement, Exhibit A; *see also Fed. Defender Program, Inc.*, 315 Ga. at 321.

3.     The Agreement further provided that the Attorney General would "not pursue an execution warrant of any prisoner other than Mr. Raulerson[2] before a total of at least six months after the time the above-three conditions are met." *Id.*

4.     One year later, the State attempted to move forward with the execution of Virgil Presnell—one of the prisoners that Defendants now concede was explicitly protected by the Agreement—notwithstanding the

---

[2] The Agreement specified Billy Raulerson as the first in line for an execution warrant because his appeals had run out in March 2020.

fact that neither the second nor third condition of the Agreement had been satisfied and without providing the agreed-upon notice. Following an emergency hearing in the Superior Court of Fulton County, the trial court concluded that Mr. Presnell and his counsel the Federal Defender had a substantial likelihood of success on the merits of their breach-of-contract claim and issued an interlocutory injunction stopping Mr. Presnell's execution. On appeal, the Supreme Court of Georgia issued a unanimous decision affirming the trial court's injunction, explaining that the Agreement "formed a valid written contract," that there was evidence the prison's modified visitation procedures "continue[d] to impose significant limitations," and that vaccines were still not available to "all members of the public." *State v. Fed. Def. Program, Inc.*, 315 Ga. 319, 344, 351 (2022).

5.     In other words, *multiple courts* have concluded that the Agreement is binding and enforceable. And Defendants now agree that they are enjoined from pursuing an execution for a certain class of death row prisoners until the Agreement's conditions have been met. But the State has now taken the position that it is nevertheless free to execute all other prisoners, regardless of whether the conditions are satisfied.

5

6.      Thus, the State has drawn a classification between death-row prisoners it considers to be protected by the Agreement and those death-row prisoners it considers unprotected by the Agreement. This attempt to create a distinct, disfavored class of death-row prisoners—without the baseline guarantee of adequate representation that is being provided to others—is plainly in violation of the Equal Protection and Due Process Clauses.

7.      In Defendants' view, Mr. Pace is among the latter classification, without the protections provided to his fellow prisoners.

8.      Accordingly, Mr. Pace respectfully requests that this Court restrain Defendants from taking any action in pursuit of a warrant for his execution and enter a declaratory judgment that obtaining a warrant before the conditions in the Agreement have been met would violate his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

9.      This action arises under 42 U.S.C. § 1983.

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, in that this action arises under the Constitution of the United States; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to secure equitable relief under an act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 28 U.S.C. § 2201(a), in that, one purpose of this action is to secure declaratory relief; and under 28 U.S.C. § 2202, in that one purpose of this action is to secure permanent injunctive relief.

11.     Venue is proper in this federal judicial district under 28 U.S.C. §§ 1391(b)(1)-(3) because (1) Defendants Oliver and Carr reside in its territorial jurisdiction, and all defendants are Georgia residents; (2) a substantial part of the events described within this Complaint and which give rise to Mr. Pace's claims occurred within this judicial district; and (3) Defendants' actions, whether individually or through subordinates, were made within this Court's territorial jurisdiction.

## PARTIES

12.     Plaintiff Lyndon Fitzgerald Pace is a United States citizen and a resident of the State of Georgia. Mr. Pace is a person within the jurisdiction of the State of Georgia.

13.     Defendant Tyrone Oliver is the commissioner of the Georgia Department of Corrections ("GDC"). As commissioner, Defendant Oliver is responsible for the supervision of operations at the GDC. He has a duty to ensure that executions are carried out in compliance with both the state and federal constitutions and departmental procedures. Defendant Oliver is sued in his official capacity as commissioner of the GDC.

14.     Defendant Christopher Carr is sued in his official capacity as Attorney General of the State of Georgia. As Attorney General, Defendant Carr "act[s] as the legal advisor of the executive department[.]" Ga. Const. art. V, § 3, ¶ IV. Defendant Carr is employed by the State of Georgia, and the actions he takes and supervises as described in this Complaint are taken under color of state law.

15.     Defendant Shawn Emmons is the warden of the Georgia Diagnostic and Classification Prison in Jackson, Georgia. As warden, Defendant Emmons is responsible for the day-to-day operations of the

8

prison, including carrying out the executions of death-sentenced prisoners.

Defendant Emmons is sued in his official capacity as warden of the prison.

## SUMMARY OF RELEVANT FACTS

### **The Agreement**

16.     In response to the COVID-19 pandemic, Georgia Supreme

Court Chief Justice Harold Melton, in his capacity as the chair of the

Judicial Council of Georgia, issued an order creating the Judicial COVID-19

Task Force ("the Task Force") on May 14, 2020. The Task Force's "mission

[was to] assist[] courts in conducting remote proceedings and in restoring

more in-court proceedings, in particular jury trials and grand jury

proceedings."[3] The Task Force's membership consisted of judges from all

levels of the state judiciary and designees from several stakeholder

organizations such as the Georgia Department of Law, the Georgia Public

Defender Council, the Georgia Association of Criminal Defense Lawyers

("GACDL"), and the Prosecuting Attorneys' Council. The Task Force

created several sub-committees, including the Criminal Matters Sub-

---

[3] Order Establishing Judicial COVID-19 Task Force,
https://georgiacourts.gov/wp-content/uploads/2020/05/Judicial-
COVID-19-Task-Force.pdf.

Committee ("Sub-Committee"), which focused on issues related to COVID-19's effect on the criminal legal system in Georgia.

17.     In the late summer and early fall of 2020, the Task Force asked for suggestions from stakeholders and advisory committee members about how to address concerns within the criminal legal system. The capital defense bar was most concerned with how the challenges of COVID-19 impaired their ability to effectively represent execution-eligible clients.

18.     COVID-19 made it difficult, if not impossible, for the Federal Defender to prepare for clemency proceedings and pre-execution litigation. Clemency proceedings, in particular, require a significant amount of work that must be completed close in time to the clemency hearing. Counsel is ethically bound to perform a thorough, contemporaneous investigation into all aspects of their client's background, condition, culpability, and legal case. And, of course, that thorough investigation is essential to presenting the best possible case for clemency, the last resort to avoid execution. Because this inquiry focuses on the client's current character, actions, prison behavior, and physical and mental condition, any investigation performed years earlier in conjunction with the legal

proceedings is inadequate to form the basis of a clemency presentation. In addition, changed facts, newly discovered evidence, advances in forensic science, and changes in the law may give rise to new legal claims. Consequently, investigation of a late-stage capital case requires substantial face-to-face meetings with the client and potential lay witnesses, consultation with expert witnesses, and exhaustive records collection. This process was rendered more difficult, and in some instances impossible, in the wake of the restrictions put in place during the pandemic.

19.    Furthermore, because federal habeas proceedings continued even after the onset of the pandemic, while executions were halted early in 2020, multiple clients of the Federal Defender became eligible for execution and for clemency. This "backlog" of warrant-eligible clients prevented the Federal Defender from being able to accurately assess how to prioritize clemency investigations among their clients.

20.    In the fall of 2020, the Georgia Association of Criminal Defense Lawyers ("GACDL") prepared draft legislation to address the capital defense bar's concerns. But instead of recommending judicial orders or legislation to address these issues, the Criminal Matters Sub-Committee

11

asked the Attorney General and the capital defense bar to work together to develop an agreement on the terms under which the State of Georgia would resume executions.

21.     Over the next few months, representatives of the State and representatives of the capital defense bar negotiated a potential agreement. Ultimately, on April 14, 2021, the parties reached a written agreement. The Agreement was memorialized in an email from Deputy Attorney General Beth Burton, asserting that "this email serves as the agreement," and was confirmed on the same day by representatives of the capital defense bar. The email states:

Anna, instead of a formal MOU, we will agree, and this email serves as the agreement, that:

Our office will not pursue an execution warrant from the District Attorney in the below defined cases before: 1) the final COVID19 judicial emergency order entered by the Chief Justice of the Supreme Court of Georgia expires; 2) the Georgia Department of Corrections lifts its suspension of legal visitation, and normal visitation resumes; and a vaccination against COVID19 is readily available to all members of the public.

After these Conditions are met, and no earlier than August 1, 2021, our office intends to request an execution warrant for Billy Raulerson. We will provide Raulerson's counsel with notice of at least three months after the three-above conditions are met before pursuing an execution warrant. Our office will also ask the District Attorney to seek the maximum warrant period of 20 days for the warrant. Our office will not pursue an execution warrant of any prisoner other than Mr. Raulerson before a total of at least six months after the time the above-three conditions are met. Upon the expiration of this six-month period, we will ask each District Attorney to seek the maximum warrant period of 20 days and will wait no less than 30 days before pursuing each subsequent warrant.

This agreement applies only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order, and will remain in effect only through August 1, 2022, or one year from the date on which the above-three conditions are met, whichever is later.

Also, we will not seek to obtain a warrant for Michael Nance form the District Attorney until the United States Supreme Court has denied a request of certiorari from the Eleventh Circuit Court of Appeals of his § 1983 litigation (originating in the United States District Court for the Northern District of Georgia, USDC-NDGA Case No. 20-cv-107) concerning an as-applied challenge to his execution by lethal injection.

This agreement is made with the understanding that the District Attorney maintains the sole authority to obtain an execution warrant.

Beth

22.     The next day, on April 15, 2021, the Agreement was formally announced to the Criminal Matters Sub-Committee. As a result, the Sub-Committee and the Task Force ceased its work on the conditions under which executions would resume in Georgia.

## The State Breaches the Agreement

23.     On April 25, 2022, a little over a year after finalizing the Agreement, the Attorney General's office informed the Federal Defender, counsel for Virgil Presnell, that they intended to seek an execution warrant

13

for Mr. Presnell. Two days later, on April 27, 2022, the Superior Court of Cobb County entered an execution order for Mr. Presnell and his execution was subsequently scheduled for May 17, 2022.

24.     On May 9, 2022, the Federal Defender filed a complaint against the State in the Fulton County Superior Court alleging a breach of the Agreement and seeking a temporary restraining order and an interlocutory injunction in order to stay Mr. Presnell's scheduled execution.[4]

25.     At a hearing held in the Fulton County Superior Court on May 16, 2022, the Federal Defender conceded that the first condition—the expiration of the final COVID-19 judicial emergency order—had been satisfied but contended that the second and third conditions—the resumption of "normal visitation" and the availability of a vaccine for "all members of the public"—had not yet been satisfied. The Federal Defender further contended that the State had breached the Agreement by giving counsel for Mr. Presnell two days' notice of its intent to pursue an

---

[4] On May 13, 2022, Mr. Presnell, represented by the Federal Defender, filed a motion to intervene as a plaintiff, which was granted by the trial court.

execution order, instead of waiting until six months after the three
conditions had been satisfied before seeking such an order.

26.    The trial court orally granted the Federal Defender's motion for
a temporary restraining order and an interlocutory injunction at the
hearing on May 16, 2022, and entered written orders the next day, May 17,
2022. The trial court's interlocutory injunction "applies until a final
judgment in th[e] case or six months have passed after (1) the [DOC] lifts
all COVID-19 restrictions on visitation and restores normal visitation
procedures and [after] (2) a Covid-19 vaccine is available to all members of
the public."

27.    The State appealed to the Supreme Court of Georgia.

28.    The Supreme Court of Georgia unanimously concluded that the
Agreement constituted a "valid written contract between the parties[.]"
*Fed. Def. Program, Inc.*, 315 Ga. at 344. The Supreme Court further held that
the trial court had not abused its discretion in rejecting the State's
"substantial compliance" argument or in concluding that the Federal
Defender had shown a substantial likelihood of success on the merits of its
breach of contract claim. *Id.* at 349-52.

29.     In a concurrence on behalf of all six Justices who heard the case,

Justice Bethel emphasized that while "it may prove inconvenient,

uncomfortable, or undesirable to the State, … *everyone* should be able to

count on the State to honor its word. … The People of Georgia, who are the

very source of the State's sovereignty, are owed a government that honors

its commitments." *Id.* at 356 (Bethel, J., concurring, joined by Boggs, C.J.,

and Ellington, McMillian, LaGrua, and Colvin, JJ.) (emphasis in original).

He concluded:

> In a society governed by the rule of law, courts must
> entertain lawfully filed cases and vindicate rights of
> parties, as defined by the law. And if the law allowed
> the State to avoid fulfilling the promises it made
> here, this Court would be bound to allow that. For
> the reasons explained in the opinion of the Court,
> however, the law thankfully does not allow that
> avoidance here. It's a shame anyone thought it
> appropriate to ask.

*Id.*

30.     The parties then proceeded to discovery in the trial court before

suspending their discovery schedule and engaging in settlement

discussions. Those discussions were broken off on February 27, 2024. Two

days later, on February 29, 2024, with no notice provided to counsel, the

16

Attorney General procured an execution order for one of the death row

prisoners in the disfavored class, Willie James Pye. Mr. Pye was executed

by the State—without the critical procedural protections afforded to others

on death row—on March 20, 2024.

31.     The Agreement's conditions remain unsatisfied. Vaccines are

not currently available to "all members of the public," and normal

visitation has not resumed in Georgia prisons, including the Georgia

Diagnostic and Classification Prison where death row is located. Legal

visitation to death row prisoners remains severely restricted, as compared

to the pre-pandemic conditions.

## CAUSES OF ACTION

### COUNT I

**Defendants' Disparate Treatment in this Matter of Life and Death
Violates Mr. Pace's Fourteenth Amendment Right to Equal Protection.**

32.     Mr. Pace incorporates by reference each and every statement

and allegation set forth throughout this Complaint as if fully rewritten.

33.     As a general matter, to state a claim for relief under the Equal

Protection Clause, a plaintiff must first "show that the State will treat him

disparately from other similarly situated persons." *Arthur v. Thomas*, 674

17

F.3d 1257, 1262 (11th Cir. 2012) (quotation omitted). A plaintiff must also show that such disparate treatment either burdens a fundamental right, targets a suspect class, or is not rationally related to a legitimate government interest. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985). Mr. Pace can make each showing here.

34. *First*, Defendants have undeniably conferred the benefit of the Agreement on those death row prisoners whose petitions for rehearing or rehearing *en banc* were denied by the Eleventh Circuit while Georgia's Judicial Emergency Order was in place. At the same time, Defendants have refused to grant that benefit to other death row prisoners, like Mr. Pace, whose petitions have been denied or may in the future be denied after the Judicial Emergency Order was lifted. *See, e.g.*, *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("[The Equal Protection Clause] keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."); *see also Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918) ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express

terms of a statute or by its improper execution through duly constituted agents.").

35.     But the timing of the Eleventh Circuit's rulings on petitions for rehearing is not a relevant distinction that renders Mr. Pace and the rest of the disfavored class differently situated from other prisoners. Regardless of the timing of those rehearing decisions, all death row prisoners currently face the same problems stemming from post-pandemic restrictions on, among other things, legal visitation. And Mr. Pace and all other death row prisoners likewise have an identical interest in receiving representation for clemency proceedings and pre-execution litigation that is unimpaired by those post-pandemic restrictions.

36.     Despite being identically situated in all relevant and material respects to the prisoners who have benefited from the Agreement, Mr. Pace and those in the disfavored class will *not* receive that unimpaired representation before facing execution. As the Supreme Court explained decades ago, "[w]hen the law lays an unequal hand on those who have committed intrinsically the same quality of offense …, it has made as an invidious a discrimination as if it had selected a particular race or

nationality for oppressive treatment." *Skinner v. State of Okl. Ex rel. Williamson*, 316 U.S. 535, 541 (1942).

37. *Second*, Mr. Pace's equal protection claim is entitled to heightened scrutiny. Mr. Pace and all those on death row retain a fundamental right to life under the Fourteenth Amendment to the United States Constitution. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and concurring in the judgment)[5] ("A prisoner under a death sentence remains a living person and consequently has an interest in his life."). *Cf. Arthur v. Comm'r, Alabama Dep't of Corr.*, 680 F. App'x 894, 916–17 (11th Cir. 2017) (unpublished) (Wilson, J., dissenting) ("fundamental right[s] … exist[] until a death row prisoner's life is taken[,] [t]he right does not vanish when a prisoner enters the execution chamber and the state begins to tinker with the machinery of death").

---

[5] Justice O'Connor's concurring opinion in *Woodard* provided the holding for that case. *See Gissendaner v. Comm'r, Georgia Dep't of Corr.*, 794 F.3d 1327, 1331 (11th Cir. 2015).

38.    "[T]he Supreme Court [has] instructed that a fundamental right must be 'objectively, deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [the right] were sacrificed." *Williams v. Pryor*, 240 F.3d 944, 955 (11th Cir. 2001) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). And while the Supreme Court, in a long line of cases, has identified numerous fundamental rights and liberty interests, including the rights to marry, have children, and use contraception, the touchstone for determining fundamental rights has always been "the specific freedoms protected by the Bill of Rights[.]" *See Glucksberg*, 521 U.S. at 720; *see also Plyler v. Doe*, 457 U.S. 202, 218 n.15 (1982) ("In determining whether a class-based denial of a particular right is deserving of strict scrutiny under the Equal Protection Clause, we look to the Constitution to see if the right infringed has its source, explicitly or implicitly, therein.").

39.    There is no right in the Bill of Rights more fundamental or sacred than the right to "life" and, with it, the right to be free from the arbitrary "depriv[ation]" of "life [and] liberty" included in the Fifth and Fourteenth Amendments.

40.     Defendants' disparate treatment here—denying the benefits of

the Agreement to one class of death row prisoners while *simultaneously*

recognizing that a similarly situated class of death row prisoners cannot be

executed because the conditions necessary for their adequate

representation in clemency proceedings and pre-execution litigation have

not been satisfied—undeniably constitutes an infringement of Mr. Pace's

fundamental right to continue living and is subject to strict scrutiny.

41.     Moreover, some form of heightened scrutiny, *at the very least*, is

demanded per *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996). In *M.L.B.*, the Supreme

Court assessed a state's civil appeal fee requirements, a scheme normally

assessed only for rationality. The Court nevertheless applied heightened

scrutiny because the disparate treatment implicated "rights this Court has

ranked as of basic importance in our society[.]" *Id.* at 116. The Court added

that a case "involving the State's authority to sever permanently a parent-

child bond, demands the close consideration the Court has long required

when a family association so undeniably important is at stake." *Id.* at 116–

17. Here, where the right being infringed implicates even higher stakes,

heightened scrutiny is surely warranted.

22

42.     *Third*, and alternatively, Defendants' disparate treatment of Mr. Pace and the other death row prisoners that the State contends are not subject to the Agreement from "those who have committed intrinsically the same quality of offense[,]" *Skinner*, 316 U.S. at 541, is without any legitimate governmental or penological interest and must fail even under rational basis review.

43.     Rational basis review is deferential, but it is not "toothless." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981); *see also Zobel v. Williams*, 457 U.S. 55, 65 (1982) (finding equal protection violation under rational basis review because the State "show[ed] no valid state interests which are rationally served by the distinction it makes between citizens who established residence before 1959 and those who have become residents since then"). And Defendants' distinction between the protected and unprotected classes of death row prisoners is not rational.

44.     Notwithstanding the plain language of the Agreement—which states that Defendants "will not pursue an execution warrant of *any prisoner* other than Mr. Raulerson before a total of at least six months after the time the above-three conditions are met" (emphasis added)—Defendants appear

willing to abide by its terms only for those prisoners whose petitions for rehearing from an adverse decision by the Eleventh Circuit Court of Appeals were denied "while the State of Georgia remained under judicial emergency order."[6]

45.     At the risk of stating the obvious, the timing of Mr. Pace's—or any prisoner's—Eleventh Circuit rehearing petition provides no reasonably conceivable basis for the classification of whether he is entitled to the critical procedural protections guaranteed in the Agreement before the extinguishment of his life. What matters is that the harms the Agreement's conditions were designed to protect against still exist today for *all* death row prisoners. The significant restrictions on legal visitation continue to hinder counsel's representation of all death row prisoners equally, regardless of when the Eleventh Circuit ruled on their petitions for rehearing.

46.     Defendants' arbitrary line drawing—ensuring that one class of death row prisoners receives meaningful procedural protections while a

_____

[6] That judicial emergency order expired on June 30, 2021.

24

second class does not—solely based on when prisoners' petitions for

rehearing or rehearing *en banc* are denied by the Eleventh Circuit, is not

rationally related in any way to a legitimate state interest and this Court

must intervene.

## COUNT II

**Defendants' Arbitrary Treatment of Mr. Pace Violates His Right to Due
Process Under the Fifth and Fourteenth Amendments.**

47.    Mr. Pace incorporates by reference each and every statement

and allegation set forth throughout this Complaint as if fully rewritten.

48.    The Due Process Clause of the Fifth and Fourteenth

Amendments "emphasizes fairness between the State and the individual

dealing with the State[.]" *Ross v. Moffitt*, 417 U.S. 600, 609 (1974); *see also*

*Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973) ("fundamental fairness [is] the

touchstone of due process"). And to "state a claim for a violation of

procedural due process rights, [a plaintiff] must allege (1) a deprivation of

a constitutionally-protected liberty or property interest; (2) state action; and

(3) constitutionally inadequate process." *Worthy v. City of Phenix City ,*

*Alabama*, 930 F.3d 1206, 1223 (11th Cir. 2019) (quotations omitted).

49.     Mr. Pace clearly has alleged the deprivation of a constitutionally protected liberty interest in his clemency proceedings and pre-execution litigation. *See, e.g.*, *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring) ("I do not, however, agree with the suggestion in the principal opinion that, because clemency is committed to the discretion of the executive, the Due Process Clause provides no constitutional safeguards."); *Yates v. Aiken*, 484 U.S. 211, 218 (1988) (post-conviction proceedings are subject to due process protections). Mr. Pace also has a separate and distinct *state* liberty interest, created by Defendants' Agreement, in adequate representation for all clemency proceedings and pre-execution litigation. *See Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) ("Whatever liberty interest exists is, of course, a *state* interest created by California law.").

50.     And where, as here, Defendants' deprivation of Mr. Pace's federal and state liberty interests—in the critical final stages of the process that precedes an official deprivation of life—results from arbitrary line-drawing, that inadequate process plainly violates the Constitution.

26

51.     Indeed, the Supreme Court, applying due process principles, has held in a long line of cases that a State cannot arbitrarily or unequally apply a protection or right, even where that protection or right itself is not constitutionally required. In *Griffin v. Illinois*, for instance, the Court addressed an Illinois law which required criminal defendants, whether indigent or not, to purchase their own transcript for appeal. 351 U.S. 12, 14 (1956). Applying both the Due Process and Equal Protection Clauses, the Court concluded that while "[i]t is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all[,] … that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants[.]" *Id.* at 18.

52.     In *Evitts v. Lucey*, the Court similarly rejected the State's argument that whatever it does or does not do on appeal is of no concern under the Due Process Clause because a State need not provide a system of appellate review as of right at all. 469 U.S. 387, 400 (1985). The Court held, to the contrary, that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with

27

the dictates of the Constitution—and, in particular, in accord with the Due

Process Clause." *Id.* at 401. *See also Morrissey v. Brewer*, 408 U.S. 471, 481-84

(1972) (the State has great discretion in setting policy as to parole decisions,

but must nonetheless make those decision in accordance with the Due

Process Clause); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (analyzing

whether the state's postconviction proceedings comported with "the

fundamental fairness mandated by the Due Process Clause"); *Woodard*, 523

U.S. at 288 (O'Connor, J., concurring) (concluding that procedural

safeguards do apply in clemency proceedings); *Swarthout v. Cooke*, 562 U.S.

216, 220 (2011) ("When, however, a State creates a liberty interest, the Due

Process Clause requires fair procedures for its vindication—and federal

courts will review the application of those constitutionally required

procedures.").

53.    As discussed extensively *supra*, Defendants and the capital

defense bar entered into an Agreement that specified the three conditions

that must occur before the resumption of executions in Georgia following

the pandemic. These conditions were chosen by the State to account for the

specific concerns identified by the capital defense bar at that time. The

promise inherent in the Agreement, in other words, was that executions would not resume until conditions allowed for death row prisoners to receive adequate representation in their clemency proceedings and pre-execution litigation. This is precisely why the Agreement provides that executions will not resume until, among other things, legal visitation returns to normal. And those conditions *still have not been satisfied*.

54.     Once the State "opt[ed] to act in [this] field," by recognizing and extending critical procedural protections for certain death row prisoners, it was required to "act in accord with … the Due Process Clause." *Lucey*, 469 U.S. at 401. It has not. Defendants' extension of critical procedural protections in clemency proceedings and pre-execution litigation to some death row prisoners, but not others, like Mr. Pace, violates the Due Process Clause of the United States Constitution.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Lyndon Fitzgerald Pace respectfully requests that this Court:

A. Enter a declaratory judgment that Defendants' refusal to provide the Agreement's protections to all death-row prisoners violates Mr. Pace's rights under the Fifth and Fourteenth Amendments.

B. Grant injunctive relief to enjoin Defendants from pursuing an execution warrant for Mr. Pace until all conditions in the Agreement have been satisfied and subject to the same notice requirements contained in the Agreement.

C. Allow Mr. Pace an opportunity to present evidence in support of the allegations in his Complaint at a hearing before this Court, to the extent Defendants' answer or response creates any factual dispute between the parties, and a reasonable opportunity to brief the issues following the evidentiary hearing.

D. Grant any further relief as it deems just and proper.

This, the 12th day of April, 2024.

Respectfully submitted,

*/s/ Nathan Potek*
Nathan Potek (Ga. 747921)
Federal Defender Program Inc.
101 Marietta Street, NW

Suite 1500
Atlanta, GA 30303
(404) 688-7530

COUNSEL FOR MR. PACE

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was served

upon counsel for Defendants via electronic mail at sgraham@law.ga.gov.

Dated this the 12th day of April, 2024.

_/s/ Nathan Potek_